**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Netrition Incorporated,<br>Plaintiff,<br>v.<br>Tyler's Coffee LLC,<br>Defendant. | No. CV-23-00363-TUC-AMM<br>**ORDER** |

Pending before the Court are Plaintiff Netrition Incorporated's ("Netrition") Motion for Partial Summary Judgment (Doc. 71) and Defendant Tyler's Coffee LLC's ("Tyler's Coffee") Motion for Summary Judgment (Doc. 73).[1]

Netrition and Tyler's Coffee are competitors in the low acid coffee market. Netrition alleges that Tyler's Coffee violated the Lanham Act's prohibition on false advertising by marketing its coffee as "acid free" because it contains acid molecules and registers a pH value of less than 7 on the logarithmic pH scale. The parties agree that a pH below 7.0 denotes an "acidic" liquid. (Doc. 74 at 3; Doc. 79 at 3.) Tyler's Coffee asserts that its advertising is not false construed under the Lanham Act because a reasonable consumer could understand its advertising to convey Tyler's Coffee does not produce the acid-related effects associated with conventional coffee or is suitable for consumers with acid-sensitive stomachs.

[1] The motions are fully briefed. (Docs. 71–74, 78–79, 84–85, 87, 88–89.) The Court held oral argument on July 22, 2026. (Doc. 95.)

Netrition seeks partial summary judgment granting a permanent injunction on Tyler's Coffee's "acid free" advertising. Tyler's Coffee seeks summary judgment as to injunctive and monetary relief for false advertising as well as Netrition's claim for unfair competition. For the following reasons, the Court will deny the motions.

## I. Procedural Background

On May 10, 2023, Netrition d/b/a Alex's Low Acid Organic Coffee filed suit against Tyler's Coffee in Pima County Superior Court. (Doc. 1-3 at 6.) Tyler's Coffee removed the matter on August 2, 2023. (Doc. 1.) On August 21, 2023, Netrition filed an Amended Complaint. (Doc. 9.)

In Count I of the Amended Complaint, Netrition alleges that Tyler's Coffee violated the Lanham Act, 15 U.S.C. § 1125, by falsely advertising its coffee as "acid free," the "World's First Acid Free Coffee," and "First and Only Acid Free Coffee." (*Id.* at 6.) In Count II, Netrition asserts a common law claim for unfair competition based on this allegedly false advertising. (*Id.* at 7.) Netrition seeks a permanent injunction prohibiting Tyler's Coffee from advertising its products as "acid free" and requiring Tyler's Coffee to notify its customers of its false statements. (*Id.*) Netrition also seeks "compensatory, pecuniary, and punitive damages in an amount to be determined at trial." (*Id.*)

Netrition filed a Motion for Partial Summary Judgment as to its claim for injunctive relief in Count I. (Doc. 71.) Tyler's Coffee thereafter filed a Motion for Summary Judgment as to all aspects of Counts I and II. (Doc. 73.)

## II. Relevant Undisputed Facts

Netrition and Tyler's Coffee are competitors in the low acid coffee market. (Doc. 72-1 at 113–14.) Netrition is owned and operated by Alexander Brecher. (Doc. 79 at 9.) Tyler's Coffee's CEO is Tyler Ornstein. (Doc. 72 at 8.) Since 2003, Netrition and Brecher have operated BariatricPal, www.bariatricpal.com, a website for individuals who have had bariatric surgery. (Doc. 79 at 9.) BariatricPal has an associated online store that sells health products and food, including both third party and private label products. (*Id.*) Tyler's Coffee produces, markets, and sells "acid-free" coffee products. (Doc. 72 at 1, 3.)

In 2016, Brecher ordered Tyler's Coffee for his personal use as someone who suffers from acid reflux. (*Id.* at 2.) Brecher personally experienced mixed results but thought others might benefit from the Tyler's Coffee. (*Id.* at 3.) In 2017, Netrition began buying Tyler's Coffee wholesale and selling it on BariatricPal. (*Id.*) Between September 2017 and January 2021, Netrition purchased at least $180,671 of Tyler's Coffee's "acid-free" products for resale on the BariatricPal online store. (Doc. 74 at 2.)

Since at least January 2020, Tyler's Coffee has advertised its coffee as "acid free," "the World's First Acid Free Coffee," and "the World's FIRST and ONLY Acid Free Coffee." (Doc. 72 at 1.) Its social-media content, website, and interviews repeat these acid free claims, and its packaging features the terms "Acid Free" or "Worlds First Acid Free Coffee," with "Acid Free" highlighted in colored font. (*Id.* at 1–2.) Tyler's Coffee products also bear a disclaimer that reads: "Acid Content May Vary Depending upon Acidity, Temperature and Source of Water Used." (Doc. 74 at 3–4.) Tyler's Coffee's profit and loss statements from 2021 to 2025 show a significant expenditure on "Advertising/Marketing Expenses." (Doc. 85 at 15.) They also show that Tyler's Coffee's profit has increased since 2020. (*Id.*)

In 2019, Netrition began selling its own private label acid free coffee, originally branded Alex's Acid-Free Coffee. (*Id.*) Netrition attempted to replicate Tyler's Coffee's roasting process. (*Id.*; Doc. 72 at 3.) Netrition continued to sell Tyler's Coffee on BariatricPal along with its private label product. (Doc. 72 at 3.)

In May 2021, Tyler's Coffee emailed Brecher alleging that Alex's Acid-Free Coffee violated trademark rights. (Doc. 74 at 2.) Around the same time, Brecher became skeptical about Tyler's Coffee's "acid-free" claims and conducted an at-home acidity test on Tyler's Coffee's product. (Doc. 85 at 2–3.) The exact timing of Brecher's at home test is not in evidence, but, when asked if it could have been a year between the time Brecher did his at home test and the May 2021 emails, Brecher testified: "No, probably not. It was probably closer. I don't know. I'm not sure." (Doc. 72-2 at 11.) After his at-home test showed the presence of acid, Brecher sent samples of Alex's Acid-Free Coffee and Tyler's Coffee to

Vanguard Laboratories for third-party testing. (*Id.* at 3; Doc. 72 at 3; Doc. 72-2 at 10–11.)

In 2022, Vanguard Laboratories reported that Alex's Acid-Free Coffee contained 3-caffeoylquinic acid, 4-caffeoylquinic acid, and 5-caffeoylquinic acid, with a total pH of 5.32. (Doc. 72-6 at 1.) Vanguard Laboratories likewise reported that Tyler's Coffee contained 3-caffeoylquinic acid, 4-caffeoylquinic acid, and 5-caffeoylquinic acid, with a total pH of 4.96. (*Id.* at 5.) At some point thereafter, Netrition rebranded its private label coffee as Alex's Low-Acid Organic Coffee and stopped selling Tyler's Coffee's products on BariatricPal. (Doc. 72 at 4.)

The parties disclosed additional lab tests of Tyler's Coffee. Including the 2022 Vanguard Laboratories report, four sources conclude that Tyler's Coffee has a pH under 7.0. A January 6, 2025 report from Analytical Resource Laboratories found Tyler's Coffee had a pH of 6.3. (Doc. 85-1 at 213.) This report was commissioned by Tyler's Coffee. (*Id.*) Likewise, a white paper by Joseph V. DiTrolio, M.D., whose name is featured in Tyler's Coffee's advertising, found that Tyler's Coffee had a pH of 6.05. (Doc. 72-11 at 3.)

Finally, Netrition's expert, Jamie Willems, Ph.D., a Senior Scientist as Eurofins SF Analytical, Inc., conducted testing on Tyler's Coffee both before and after brewing. (Doc. 72 at 4–5.) She concluded that both unbrewed and brewed Tyler's Coffee "were found be to acidic (pH ranging from 5.09 to 5.35) and contain notable amounts of titratable acidity as compared to the control . . . ." (*Id.*) Dr. Willems found that the average pH for Tyler's Coffee was 5.11 for brewed coffee and 5.32 for unbrewed coffee. (Doc. 72-3 at 5.)

Only one of the reports in evidence shows Tyler's Coffee with a pH above 7.0—a May 11, 2019 Eurofins Microbiology report commissioned by Tyler's Coffee indicating a pH of 7.67. (Doc. 79-6 at 3.) Eurofins Microbiology also found that Tyler's Coffee contained neochlorogenic acid, chlorogenic acid, 4-caffeoylquinic acid, 3-feruloylquinic acid, 4-feruloylquinic acid, and 5-feruloylquinic acid. (Doc. 72-7 at 2.) As fully discussed in Section IV(A)(2)(i)(c), the parties dispute the reliability of this report. Netrition argues the report is unreliable because it is missing pages, lacks a certification or signature, and was not presented through an expert. (Doc. 85 at 11.) Tyler's Coffee asserts the missing

pages are "immaterial." (Doc. 79 at 5.) As CEO of Tyler's Coffee, Ornstein averred that he did not recall what was on those missing pages or where they would be located. (Doc. 72-1 at 55–56.)

Ornstein explained in his deposition that what "sets [his] coffee apart from all other coffees" is that Tyler's Coffee is "the first and ever acid-free coffee." (Doc. 85 at 14; Doc. 72-1 at 72.) Ornstein stated: "It was enjoyable to see that people that couldn't drink coffee anymore could drink our coffee . . . . [C]ountless [] people state that they absolutely adore Tyler's Coffees and swear by it." (*Id.* at 74.) When asked whether the "allegedly acid-free nature of [his] coffee" is "essential to [his] brand," Ornstein replied: "Yes." (*Id.* at 75.) Ornstein was then asked: "And to the people who buy your brand, that's essential to them, too, then; right?" (*Id.*) He responded: "Absolutely." (*Id.*) Ornstein acknowledged that Tyler's Coffee advertises as "acid free" although is contains *some* acid. (*Id.* at 109.) He asserted, however, that Tyler's Coffee has "never said 'no,' or 'non,' or 'a hundred percent' in any of [its] branding." (*Id.* at 110.) Ornstein stated that Tyler's Coffee contains "naturally forming acids in all plant matter." (*Id.* at 59.)

Netrition offers a handful of customer reviews from Tyler's Coffee's website from allegedly "verified buyer[s]." (Doc. 72 at 8; Doc. 72-12 at 25.) Ornstein confirmed in his deposition that reviews are only posted to Tyler's Coffee's website if they come from "verified" customers who purchased the product. (Doc. 72 at 8.) One customer named "Michael Rauen" posted: "When the doctor said to quit coffee because of the acid, it was a horrible day. Finding Tyler's acid free changed that! No acid, yet still a great rich taste. Thank you!!" (Doc. 72-12 at 29.) Another review from "Vickie Russell" read: "I can't have regular coffee. Have to have acid free. Love the taste." (Doc. 72-13 at 29.) Finally, Netrition points to a review from "Gordon Mintzer" that said: "The dentist noticed, and assumed I had quit coffee. I said no 'just quit the acid' which is saving my enamel." (Doc. 72-14 at 29.) In addition to the online reviews, Netrition offers Brecher's personal experience as a consumer and his initial use of the product based on his belief that Tyler's Coffee did not contain acid. (Doc. 72 at 9.) Netrition did not conduct or offer evidence of

any consumer surveys for this litigation. (Doc. 79 at 12.)

**III. Summary Judgment Standard**

The Court grants summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show[] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(a), (c)). An issue is genuine when a reasonable jury could resolve the disputed facts in favor of either party. *See Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250–51 (1986)). A disputed fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of establishing there is no genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the non-movant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586–87. Likewise, the non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247–48. Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

The Court's role at the summary judgment stage is to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249–50. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted).

On cross motions for summary judgment, the Court "review[s] each motion . . . separately, giving the nonmoving party for each motion the benefit of all reasonable inferences." *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 995 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 167 (2017). The Court may consider either party's evidence in the opposing party's motion when deciding whether to grant either summary judgment motion. *See Fair Hous. Council v. Riverside Two,* 249 F.3d 1132, 1136–37 (9th Cir. 2001).

## IV. Motions for Summary Judgment

### A. Count I: False Advertising

#### 1. Statute of Limitations

As a threshold matter, the Court will address Tyler's Coffee's argument that Count I is barred by the statute of limitations and doctrine of laches.

Tyler's Coffee asserts Brecher knew or should have known "whether the 'Acid Free' claims made by both Tyler's Coffee and Netrition were true" as early as 2017 because Netrition sold Tyler's Coffee and was aware of the "acid free" advertising at that time. (Doc. 78 at 2, 16–17; Doc. 73 at 15.) Tyler's Coffee further argues that, because Brecher did not recall precisely when he performed his at home acidity test, Netrition could have been "actually aware" of the falsity before the statute of limitations period began to accrue. (Doc. 73 at 15.)

The Lanham Act does not contain a statute of limitations. 15 U.S.C. § 1125(a)(1)(B). Rather, the doctrine of laches is the operative timeliness defense under the Lanham Act. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002). "While laches and the statute of limitations are distinct defenses, a laches determination is made with reference to the limitations period for the analogous action at law." *Id.* In other words, "[i]f the plaintiff filed suit within the analogous limitations period, the strong presumption is that laches is inapplicable." *Id.*

The Ninth Circuit has applied Arizona's three-year limitations period for fraud claims to the laches analysis under the Lanham Act. *Au-Tomotive Gold Inc. v. Volkswagen of Am., Inc.*, 603 F.3d 1133, 1140 (9th Cir. 2010). "[I]n determining the presumption for

laches, the limitations period runs from the time the plaintiff knew or should have known about his § 43(a) cause of action." *Jarrow*, 304 F.3d at 838.

A defendant asserting laches must show that the plaintiff's delay in filing suit was unreasonable and that the defendant would suffer prejudice if the suit were allowed to continue. *Id.* There are two steps to determine whether a party unreasonably delayed filing suit. *Id.* First, the Court "assess[es] the length of delay, which is measured from the time the plaintiff knew or should have known about its potential cause of action." *Id.* Second, the Court "decide[s] whether the plaintiff's delay was reasonable[,]" which "is considered in light of the time allotted by the analogous limitations period." *Id.* (finding that plaintiff's seven-year delay was unreasonable because the delay was more than twice the analogous three-year limitations period).

Netrition filed suit on May 10, 2023. Thus, the analogous statute of limitations period began to accrue on May 10, 2020. The Court finds that Tyler's Coffee is not entitled to a laches defense as a matter of law because there is a genuine dispute whether Netrition knew or should have known that Tyler's Coffee's advertising was false before May 10, 2020.

First, Tyler's Coffee's argument that Netrition should have known as early as 2017 when it started selling Tyler's Coffee's products is unpersuasive. There appears to be an inconsistency regarding when Tyler's Coffee first began this advertising. Tyler's Coffee admits that "since approximately January 2020 [Tyler's Coffee] advertised [its] coffee products as 'acid free,' the 'World's First Acid Free Coffee,' and/or the 'World's First and Only Acid Free Coffee.'" (Doc. 72-4 at 2; Doc. 79 at 1.) Therefore, Tyler's Coffee's advertising prior to January 2020 is not before the Court. But even if Tyler's Coffee advertised in the same manner in 2017, at most this evidence shows that Netrition was aware of the advertising, not that Netrition had reason to believe the advertising was false.

Second, although Tyler's Coffee argues that Brecher could have performed his at-home acidity test before May 10, 2020, there is also evidence that Brecher believed he performed the test around May 2021, well within the three-year period. Likewise, Netrition

asserts that it did not *know* about the false advertising until it received the Vanguard Laboratories report in January 2022. Under those facts, Netrition waited at most two years to file suit from the at-home test and only one year from when it received laboratory results to confirm Brecher's suspicion. This falls within the three-year period and, if true, would not constitute an unreasonable delay.

Thus, genuine disputes of material fact preclude a finding that Tyler's Coffee is entitled to summary judgment on the timeliness of Netrition's lawsuit. The Court will next assess the substance of Netrition's false advertising claim.

**2. Elements of False Advertising**

The Lanham Act prohibits the use of any "false or misleading description of fact, or false or misleading representation of fact" that, "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities[.]" 15 U.S.C. § 1125(a)(1)(B). Generally, "any person who believes that he or she is or is likely to be damaged by such act" may bring suit for false advertising under the Lanham Act. *Id.*

A false advertising claim under the Lanham Act requires a showing that "(1) the defendant made a false statement either about the plaintiff's or its own product; (2) the statement was made in commercial advertisement or promotion; (3) the statement actually deceived or had the tendency to deceive a substantial segment of its audience; (4) the deception is material; (5) the defendant caused its false statement to enter interstate commerce; and (6) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant, or by a lessening of goodwill associated with the plaintiff's product."[2] *Jarrow*, 304 F.3d at 835 n.4.

**i. Literal Falsity**

**a. Applicable Law**

A false statement within the meaning of the Lanham Act may be (1) "literally false,

[2] The parties do not dispute that the statements at issue were used in commercial advertisements that entered interstate commerce (i.e., elements two and five). (Doc. 88 at 3 n.1; Doc. 78.)

either on its face or by necessary implication" or (2) "literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). An allegedly false claim must always be analyzed in the full context of the advertisement rather than isolating a word or phrase. *Id.* at 1139.

"The standard for proving literal falsity is rigorous." *Global Brother SRI v. Altun*, No. CV-25-00426-TUC-SHR, 2026 WL 1413605, at *2 (D. Ariz. May 20, 2026) (citing *Buetow v. A.L.S. Enters., Inc.*, 650 F.3d 1178, 1185 (8th Cir. 2011)). A claim is only literally false where the advertisement conveys one objectively verifiable and unambiguous factual proposition that is measurably false. *See id.* (citing *In re Century 21–RE/MAX Real Estate Advert. Claims Litig.*, 882 F. Supp. 915, 923 (C.D. Cal. 1994) ("To be 'literally false' the statement must be unambiguously false."); *Southland Sod*, 108 F.3d at 1139–40; *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)).

A plaintiff can show that a claim based on product testing is measurably false by establishing that the tests underlying the advertisement "'are not sufficiently reliable to permit one to conclude with reasonable certainty that they established' the claim made." *Southland Sod*, 108 F.3d at 1139 (quoting *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991)). Furthermore, "[w]hile product superiority claims that are vague or highly subjective often amount to nonactionable puffery . . . . [a] specific and measurable advertisement claim of product superiority based on product testing is not puffery." *Id.* at 1145 (citation omitted).

A claim cannot, however, be literally false if it is reasonably susceptible to a different, truthful reading in the context of the entire advertisement. *See, e.g.*, *Time Warner Cable*, 497 F.3d at 158; *Global Brother SRI*, 2026 WL 1413605, at *2. If a claim is not literally false but only likely to mislead consumers, the plaintiff must show that the advertisement actually deceived or tended to deceive a substantial portion of the intended audience. *Southland Sod*, 108 F.3d at 1139–40.

**b. Parties' Arguments**

Netrition argues that Tyler's Coffee is acidic and, therefore, Tyler's Coffee's

advertisements claiming that its coffee is "acid free" are literally false. (Doc. 71.) Netrition underscores that all the admissible lab tests show Tyler's Coffee contains acid and has a pH below 7.0. (*Id.* at 7.) Netrition further cites Ornstein's admission that Tyler's Coffee contains naturally forming acids. (*Id.*)

In response, Tyler's Coffee identifies "the false premise that "'Acid Free' necessarily means 'containing zero acid molecules.'" (Doc. 78 at 7, 10.) It maintains that, in context, a reasonable consumer could understand the phrase to convey that its coffee has reduced acidity, does not produce the acid-related effects associated with conventional coffee, or is suitable for consumers with acid-sensitive stomachs. (*See id.* at 7–10.) Even if "acid" were defined solely as pH, Tyler's Coffee relies on the 2019 Eurofins Microbiology report to argue that "*brewed* Tyler's Coffee [] products can in fact be 'acid-free,' in the sense that they are 'basic' on the pH scale (a pH greater than 7.0)." (*Id.* at 9.)

Tyler's Coffee further relies upon the fact that there is no applicable regulatory definition of when a product can be labeled "acid free" but asserts the federal regulations for "sugar free," "fat free," and "zero calories" are instructive. (*Id.* at 8.) Specifically, companies are permitted to advertise a product as "sugar free" when it contains up to 0.5 grams of sugar; "fat free" when it contains up to 0.5 grams of fat; and "zero calories" when it contains up to 5 calories. (*Id.* (citing 21 C.F.R. §§ 101.62, 101.60).)

**c. Analysis**

"Acid free" is an affirmative measurable statement concerning a characteristic of Tyler's Coffee. Unlike generalized puffery that the coffee is "better," "gentler," or "easier to drink," the phrase identifies a particular attribute—freedom from acid—that can be evaluated through chemical testing. The phrase is also absolute in form. A reasonable factfinder could therefore conclude that "acid free," especially when featured prominently on packaging and coupled with phrasing like "The World's FIRST and ONLY," conveys an unambiguous factual proposition that the product is chemically non-acidic because it does not contain acid or because it has a pH above 7.0.

If these were the only definitions of the phrase "acid free," the Court would have to

find that Tyler's Coffee's advertisements are literally false. There is no genuine dispute that Tyler's Coffee contains acid or has a pH below 7.0. Ornstein admitted that Tyler's Coffee contains naturally occurring acid. Likewise, multiple reports, including the 2022 report from Vanguard Laboratories, Dr. DiTrolio's white paper, and the 2025 Analytical Resource Laboratories test, show brewed Tyler's Coffee contains acid and registers pH values under 7.0. Netrition's expert Dr. Willems similarly concluded that both brewed and unbrewed Tyler's Coffee are acidic on the logarithmic pH scale with an average pH of 5.11 (brewed) and 5.32 (unbrewed).

The only evidence that Tyler's Coffee has a pH above 7.0 is the 2019 Eurofins Microbiology report. The Court may not properly consider this report, however, because Tyler's Coffee has not shown it would be admissible at trial. Fed. R. Civ. P. 56(e); *Orr v. Bank of Am. NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (only admissible evidence may be considered in ruling on a motion for summary judgment). "Authentication is a 'condition precedent to admissibility,' and this condition is satisfied by 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Orr*, 285 F.3d at 773 (quoting Fed. R. Evid. 901(a)). Therefore, "unauthenticated documents cannot be considered in a motion for summary judgment." *Id.* (collecting cases).

The 2019 Eurofins Microbiology report is unauthenticated, and Tyler's Coffee has not demonstrated it can authenticate the report. While Dr. Willems's report is the only lab test in evidence accompanied by a sworn declaration, the other reports contain names or signatures of the people who conducted or reviewed the test who could potentially be called to testify at trial. *See Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021) (holding the court could consider hearsay evidence at summary judgment because the authors of the objected-to opinions in reports written by expert witnesses, deputies, and medical examiners could testify at trial). Yet, unlike the other reports, the 2019 Eurofins Microbiology report does not contain any name or signature to identify any person who could authenticate the document. Neither has Tyler's Coffee hired any expert to replicate the results. Instead, Tyler's Coffee merely states that the missing pages are "immaterial."

(Doc. 79 at 5.) This argument is unpersuasive, and in the report's absence, there is no evidence that Tyler's Coffee has a pH above 7.0.

Nonetheless, on this record, the Court cannot conclude as a matter of law that "acid free" unambiguously conveys the message that Tyler's Coffee does not contain acid or has a pH above 7.0. Instead, there remains a genuine dispute of material fact whether chemical composition and pH are the only reasonable definitions of "acid free" in the full context of the advertisement.

Unlike "sugar free," "fat free," and "calorie free" labels on foods, there is no single ordinary, technical, industry, or agreed meaning for "acid free" coffee.[3] Instead, the Court is required to look at the surrounding language, the product's packaging, and the disclaimers to assess whether a consumer could reasonably interpret Tyler's Coffee's message differently.

Tyler's Coffee's disclaimer is likely the strongest evidence precluding summary judgment in Netrition's favor. It reads, "Acid Content May Vary Depending upon Acidity, Temperature and Source of Water Used." This statement, though not the primary message of the advertisement, is not wholly unrelated fine print. It directly alerts the consumer that there *may be* acid content. This disclaimer could reinforce Netrition's reading that Tyler's Coffee's "acid free" advertising is literally false because the coffee contains acid. It could also be read to imply that it is the water, and not the coffee, that contains acid, which in and of itself could be a false statement. But, viewed in Tyler's Coffee's favor, it could also support an inference that "acid free" does not promise the product contains literally no acid.

The Court further observes that Tyler's Coffee advertises itself to acid-sensitive consumers whose concerns focus on avoiding the acid-related effects commonly associated

---

[3] The Court notes that Tyler's Coffee's analogy to FDA regulations is perhaps illustrative, it is not dispositive at summary judgment because the Supreme Court has held that "food and beverage labels regulated by the [Federal Food, Drug, and Cosmetic Act] are not, under the terms of either statute, off limits to Lanham Act claims." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 113–16 (2014). In other words, simply because the challenged claim does not run afoul of FDA regulations does not decide whether the claim violates the Lanham Act as a false advertisement.

with ordinary coffee. That market context is relevant because it informs how a reasonable consumer could understand the phrase "acid free." The customer reviews offered by Netrition support Netrition's interpretation that consumers purchased Tyler's Coffee believing it was free from acid. Statements like (1) "When the doctor said to quit coffee because of the acid, it was a horrible day. Finding Tyler's acid free changed that! No acid, yet still a great rich taste[,]" (Doc. 72-12 at 29); (2) "I can't have regular coffee. Have to have acid free. Love the taste[,]" (Doc. 72-13 at 29); and (3) "The dentist noticed, and assumed I had quit coffee. I said no 'just quit the acid' which is saving my enamel[,]" (Doc. 72-14 at 29) reasonably support Netrition's position. But they also support the reasonable inference that purchasers understood Tyler's Coffee's advertisement to convey tolerability. In other words, the reviews reflect that at least some purchasers understood the advertising to address the ability to drink coffee without the acid-related discomfort or other undesirable effects, rather than as an unqualified representation that the product contains no acid whatsoever.

On this record, a reasonable jury could find that the challenged claims convey an unqualified and demonstrably false promise that Tyler's Coffee contains no acid or has a non-acidic pH. However, it could also find that the advertisement as a whole communicates only that Tyler's Coffee has reduced acidity or avoids the acid-related effects of ordinary coffee. The Court's task is not to weigh these competing inferences. It is to determine whether a reasonable jury could adopt either party's interpretation of the claim in the full context of the advertisement. The Court finds that it could. The meaning of "acid free" and whether Tyler's Coffee's product failed to conform to that meaning therefore present genuine disputes of material fact as to literal falsity.

**ii. Consumer Deception and Materiality**

Ordinarily, to prevail on its false advertising claim, Netrition must show that Tyler's Coffee's advertisements "actually deceived or had the tendency to deceive a substantial segment of [its] audience" and that the deception was material—that is, likely to influence consumer purchasing decisions. *See Jarrow*, 304 F.3d at 835 n.4.

Netrition argues that the online customer reviews provide undisputed evidence of deception and materiality. (Doc. 71 at 13–14, 16–17.) Netrition also relies on Brecher's personal experience as a consumer and his belief that Tyler's Coffee did not contain acid. (Doc. 84 at 9.)

That evidence, standing alone, likely would not establish that a substantial segment of the relevant audience was deceived. Even assuming the online reviews are admissible, a limited number of anecdotal customer statements does not demonstrate deception among a significant portion of consumers.[4] *See LegalZoom.com Inc. v. Rocket Law. Inc.*, No. CV 12-9942 GAF (AGRx), 2013 WL 12121303, at *6 (C.D. Cal. Oct. 17, 2013) (quoting *William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995)) ("[A] handful of customer reviews on one online review site is not sufficient to demonstrate that a 'significant portion' of customers were deceived and is not necessarily a reliable consumer survey or market research."). Netrition has not presented any consumer surveys evidence of wider consumer deception or materiality.

Nonetheless, this does not defeat Netrition's claim. When an advertisement is literally false, consumer deception is presumed, and the plaintiff need not submit independent evidence of actual deception. *See U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040–41 (9th Cir. 1986); *Chaverri v. Platinum LED Lights, LLC*, No. CV-21-01700-PHX-SPL, 2022 WL 2275664, at *5 (D. Ariz. June 22, 2022) (collecting cases). Although the Ninth Circuit has not squarely addressed whether materiality is likewise presumed upon a showing of literal falsity, district courts within the Ninth Circuit have repeatedly applied that presumption. *See, e.g.*, *Chaverri*, 2022 WL 2275664, at *5 (collecting cases); *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 360 F. Supp. 3d 1039,

---

[4] Although Tyler's Coffee argues the online reviews are inadmissible hearsay, the Court need not decide this question because there is a genuine dispute regarding consumer deception that depends on the literal falsity of Tyler's Coffee's advertisements. Nevertheless, the Court notes that the online reviews would likely be admissible as non-hearsay because the reviews are not offered for the truth of the matter asserted (i.e., the taste of the coffee) but rather to show the effect on the consumer. *See* Fed. R. Evid. 801(c)(2).

1052 (S.D. Cal. 2019); *POM Wonderful LLC v. Purely Juice, Inc.*, No. CV-07-02633 CAS (JWJx), 2008 WL 4222045, at *11 (C.D. Cal. July 17, 2008), *aff'd*, 362 F. App'x 577 (9th Cir. 2009) (collecting cases).

Because a genuine dispute of material fact remains as to literal falsity, summary judgment is not warranted on the related issues of consumer deception and materiality. A jury could find that Tyler's Coffee's advertisements are literally false, in which case Netrition need not independently prove consumer deception or materiality.

**iii. Damages**

First, to the extent Netrition seeks injunctive relief, it need not prove actual damages or injury to establish a violation of the Lanham Act. *Southland*, 108 F.3d at 1145 (quoting *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989)) ("[A] competitor need not prove injury when suing to enjoin conduct that violates section 43(a)."). Netrition's Motion for Partial Summary Judgment only addresses injunctive relief and does not seek an award of damages.

However, Netrition raises a claim for damages in Count I of the Amended Complaint, and Tyler's Coffee's Motion for Summary Judgment seeks an alternative ruling precluding Netrition from pursuing a claim for damages. (Doc. 73 at 2.) The Court therefore addresses damages.

To recover damages, the plaintiff must show that it "has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant, or by a lessening of goodwill associated with the plaintiff's product." *Jarrow*, 304 F.3d at 835 n.4. The Ninth Circuit has "generally presumed commercial injury when defendant and plaintiff are direct competitors and defendant's misrepresentation has a tendency to mislead consumers." *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 649 F. App'x 609, 616 (9th Cir. 2016) (quoting *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 826 (9th Cir. 2011)). "This presumption is warranted even in false advertising cases because, when competitors vie for the same customers, 'a misleading ad can upset their relative competitive positions' and thereby cause injury." *Id.* at 615–16 (quoting

*TrafficSchool.com*, 653 F.3d at 827). Thus, although "a court cannot assume injury without any evidence of causality and consumer deception[,]" a plaintiff who presents "evidence of direct competition . . . provides a causal link[] and a likelihood of consumer deception." *Id.* at 616 (citing *Harper House*, 889 F.2d at 210).

Here, there is no dispute that Netrition and Tyler's Coffee directly compete in the low-acid coffee market. Further, as discussed above, the record would permit a reasonable jury to find that Tyler's Coffee's "acid free" advertising is literally false or, at minimum, has a tendency to mislead consumers. If the jury so finds, it could also conclude that Netrition suffered, or was likely to suffer, presumed commercial injury from Tyler's Coffee's challenged advertising. Netrition has therefore raised a triable issue on injury sufficient to defeat Tyler's Coffee's request for summary judgment on damages.

For these reasons, neither party is entitled to summary judgment on Count I. There are triable issues of fact as to whether Tyler's Coffee's advertisements are false, and therefore, as to whether Netrition can sufficiently satisfy the consumer deception, materiality, and injury requirements of a false advertising claim. Accordingly, the Court will deny Plaintiff's Motion for Partial Summary Judgment. The Court will likewise deny the portion of Defendant's Motion for Summary Judgment that relates to Count I.

**B. Count II: Unfair Competition**

Tyler's Coffee also moves for summary judgment on Count II. (Doc. 73.) It argues that the claim for unfair competition is time barred. (*Id.* at 2.) Tyler's Coffee explains that it is unclear whether a two- or three-year statute of limitations applies to unfair competition claims. (*Id.* at 16.) Under either statute of limitations, however, Tyler's Coffee repeats that Netrition knew or should have known about the facts underlying its false advertising claim as early as 2017. (*Id.*) Tyler's Coffee further argues that Netrition's state law unfair competition claim is preempted by the Lanham Act because Count II "asserts substantively the same allegations" as Count I. (*Id.* at 2, 16–17.)

As a threshold matter, Arizona does not have a specific statute of limitations for unfair competition claims, but courts in this district have applied the same three-year

limitations period that they apply to Lanham Act claims. *See Ranch Realty, Inc. v. DC Ranch Realty, LLC*, 614 F. Supp. 2d 983, 989–90 (D. Ariz. 2007) (quoting *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 915 (9th Cir. 1980)) ("Given that trademark infringement claims [under the Lanham Act] and claims of unfair competition are 'substantially congruent,' the Court will apply a three-year limitations period to Plaintiff's unfair competition claim."). As the Court previously explained, there is no decisive evidence that Netrition knew or should have known that Tyler's Coffee was acidic before May 10, 2020. *See supra* Section IV(A)(1). The Court cannot, therefore, conclude at this stage that Netrition's unfair competition claim is time barred because there is a genuine factual dispute about when Netrition knew or should have known about the alleged falsity of Tyler's Coffee's advertising.

Furthermore, Netrition's state law unfair competition claim is not preempted by the Lanham Act. Arizona's common law doctrine of unfair competition "encompasses several tort theories, such as trademark infringement, false advertising, 'palming off,' and misappropriation." *ACT Grp. Inc. v. Hamlin*, No. CV-12-567-PHX-GMS, 2012 WL 2976724, at *6 (D. Ariz. July 20, 2012) (citing *Fairway Constructors, Inc. v. Ahern*, 970 P.2d 954, 956 (Ariz. Ct. App. 1998)). Unfair competition claims asserting misappropriation through copyright infringement are preempted by the Copyright Act. *See Health Indus. Bus. Commc'ns Council Inc. v. Animal Health Inst.*, 481 F. Supp. 3d 941, 956 (D. Ariz. 2020). But courts have declined to recognize preemption of unfair competition claims based on false advertising. *Id.* ("The Court does not agree that this means the federal claims [for false advertising] preempts the state law claim. In fact, numerous courts have analyzed these types of claims together.").

Accordingly, the Court will deny Defendant's Motion for Summary Judgment as it relates to Count II.

///

///

///

## V. Conclusion

For the foregoing reasons,

**IT IS ORDERED:**

(1) Plaintiff's Motion for Partial Summary Judgment is **DENIED**. (Doc. 71.)

(2) Defendant's Motion for Summary Judgment is **DENIED**. (Doc. 73.)

Dated this 30th day of September, 2026.



Honorable Angela M. Martinez
United States District Judge